583 F.Supp. 458 (1984)
Ollie WALTON, Plaintiff,
v.
ST. LOUIS COMMUNITY COLLEGE, et al., Defendants.
No. 82-786C(1).
United States District Court, E.D. Missouri, E.D.
March 30, 1984.
*459 *460 *461 Louis Gilden, St. Louis, Mo., for plaintiff.
Thomas E. Wack, St. Louis, Mo., for defendants.

MEMORANDUM
NANGLE, Chief Judge.
Plaintiff Ollie Walton brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and § 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981. She alleges that the discriminatory actions of defendants denied her a promotion, and a sabbatical leave on account of her race. In addition, plaintiff alleges that she was subjected to harassment, on account of her race, in the following ways: 1) plaintiff was required to give written explanations for her absence from faculty meetings; 2) defendants allowed secretaries to be rude to plaintiff and to delay performing work for plaintiff; 3) plaintiff was given extra duties; and 4) plaintiff was denied a pay increase. Plaintiff further alleges that she was denied extended time to prepare class proposals, that she was denied a second sabbatical leave, and that she was counted as absent for days she was not scheduled to teach, on account of her race and in retaliation for filing racial discrimination complaints. Therefore, plaintiff contends that she is entitled to relief under Title VII and § 1981 because the actions of defendants are in violation of said statutes, which prohibit race discrimination and guarantee employees the right to oppose unlawful employment practices.
This case was tried to the Court sitting without a jury. The Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 52(a).

A. FINDINGS OF FACT
1. Plaintiff Ollie Walton is a black female resident of the State of Missouri and was at all times relevant herein a citizen of the United States.
2. Defendant St. Louis Community College is a body corporate and subdivision of the State of Missouri existing pursuant to law. Defendant St. Louis Community College maintains its "District Office" within the City of St. Louis, Missouri, and in addition thereto, operates three constituent college campuses within the City of St. Louis and St. Louis County.
3. Defendants Claude Brown, Kenneth Carrol, Martin Corcoran, John Roedel, Jr., Michelle Walter and Donald Witte are each Board Members and together constitute the Board of Trustees of St. Louis Community College.
4. At the Florissant Valley Campus, there are five academic divisions: Communications and Art; Business and Mathematics; Science, Engineering & Technology; Instructional Resources and Human Services. *462 There are five departments within the Human Services Division: Physical Education, Home Economics, History & Geography, Psychology and Sociology/Political Science. At all times relevant hereto, David Harris was President of the Florissant Valley Campus, Betty Duvall was Dean of Instruction and Sharon McPherron was Associate Dean of the Human Services Division.
5. Plaintiff was first employed on a full-time basis by St. Louis Community College in 1974 as an instructor of psychology at the Florissant Valley Campus.
6. Prior to the academic year 1976-1977, the Administrative Procedures at St. Louis Community College regarding advancement in rank provided that the president of each campus (at that time known as the "College President") recommended all advancements to the rank of Assistant Professor, and also to the rank of Associate Professor, to the Chancellor (at that time known as the "District President") for approval by the Board of Trustees.
7. In April, 1976, the Board of Trustees of St. Louis Community College issued a Policy Statement concerning the criteria and procedure for promotion in academic rank as a means of recognizing the accomplishments and contributions of faculty members and not attaining promotion automatically through length of service or by accumulation of degree and graduate credits. This Policy Statement placed responsibility on the Chancellor to establish administrative procedures utilizing promotion committees in the promotion process for review of candidates for promotion to Assistant Professor, Associate Professor and Professor.
8. On December 13, 1976, the Administrative Procedures implementing the Board Policy on Faculty Promotion in Academic Rank were issued. These procedures provided for the use of promotion committees from each division at a campus and also a College-Wide Promotion Committee to review and evaluate the letters of application and various evaluation forms of each candidate for promotion to the rank of Assistant Professor and Associate Professor. In order to be considered for promotion, a candidate must have met certain minimum qualifications for the next higher rank and have served at least three (3) years in his/her current academic rank.
Under these Administrative Procedures, each division promotion committee reviews each application for promotion, and thereafter develops a composite rating for each application from that division in accordance with the criteria for promotion set forth in the Administrative Procedures. Thereafter, the division committee recommends a priority rank order for the candidates.
The individual rating forms, the composite ratings and the priority rank order are reviewed by the Division Chairperson who recommends approval or disapproval of each promotion request.
The letters of application, individual and composite evaluation forms, priority rank order and Division Chairperson recommendations are then forwarded to the College-Wide Promotion Committee. After review of this material, each member of the College-Wide Promotion Committee rates each applicant on the criteria set forth in the Administrative Procedures.
The college-wide committee prepares an evaluation report for each candidate being considered for promotion displaying the composite promotion points on each of the criteria and a total. These reports are forwarded to the Dean of Instruction along with the recommendations of the Dean to the respective College President.
9. In January, 1977, after having served the minimum period of three (3) years as an Instructor, plaintiff applied for promotion to the rank of Assistant Professor. Although she had not met the minimum qualifications for the rank of Assistant Professor, plaintiff requested and was given a waiver of those minimum qualifications. The division promotion committee reviewed the application of plaintiff for promotion and did not give her a good composite evaluation rating. Thereafter, plaintiff sent a memo to Betty Duvall, Dean of *463 Instruction and also Chairperson of the College-Wide Promotion Committee requesting review and re-evaluation of her promotion application. Betty Duvall provided plaintiff's memo to the College-Wide Promotion Committee for review together with the other promotional material and, by plaintiff's admission, was supportive. Of the fourteen (14) candidates for promotion to the rank of Assistant Professor at the Florissant Valley Campus, the College-Wide Promotion Committee ranked plaintiff fourteenth. All fourteen (14) candidates for promotion to Assistant Professor were recommended for promotion by the College-Wide Promotion Committee and also by Dean of Instruction Betty Duvall and President Raymond Stith. Plaintiff received the promotion to rank of Assistant Professor in 1977.
10. At the time plaintiff was hired by defendants, she held both a Bachelor of Arts degree and a Master of Science degree in psychology. In 1978, plaintiff earned the rank of Doctor of Philosophy in psychology from St. Louis University. At all times during plaintiff's employment, plaintiff performed her duties of teaching psychology in a professional and competent manner.
11. In March, 1979, the Associate Dean of the Human Services Division requested a visit to plaintiff's class. Plaintiff declined the request.
12. In April, 1979, an incident occurred between plaintiff and Shirley Patterson Davis, a black female secretary in the Human Services Division. The incident was an argument that occurred near Ms. Davis' desk in the Human Services Division at a time when students were changing classes. Plaintiff cursed and threatened Ms. Davis in a loud voice. Ms. Davis detected the smell of alcohol on plaintiff's breath.
Bob Kilpatrick and Jeanette Kimbrough, both faculty from the Human Sciences Division, heard the argument and emerged from their offices. Ms. Kimbrough entered plaintiff's office and tried to calm her down, but she remained irate and spoke in a loud voice.
13. Upon arriving at school the following day, Ms. McPherron was advised of the events of the previous evening. Ms. McPherron requested Ben Bommarito, as chairman of the psychology department and plaintiff's immediate supervisor, to discuss the events with plaintiff. Ms. McPherron also suggested that Mr. Bommarito be present in the evening when plaintiff and Ms. Davis were both working, to protect Ms. Davis from plaintiff. Mr. Bommarito refused the latter request. Ms. McPherron entered the incident in plaintiff's personnel file.
14. On May 11, 1979, at plaintiff's request, Dr. Harris called a conference consisting of Betty Duvall, Sharon McPherron, Ben Bommarito, plaintiff and himself to discuss the continuing problems of good working relationships between plaintiff and various members of the staff, faculty and students. Plaintiff herself produced a chronology at that meeting that demonstrated that she had a long-standing history of inter-personal problems with staff and faculty.
At the same meeting Ms. McPherron handed two (2) memoranda to plaintiff and other persons present at the meeting. The first memo detailed Ms. McPherron's understanding of plaintiff's argument with Ms. Davis. Ms. McPherron characterized the incident as "serious" and "unprofessional." Ms. McPherron stated that plaintiff's charges against Ms. Davis  that Ms. Davis intentionally mishandled plaintiff's December paycheck and a phone call to plaintiff on April 6  were unsubstantiated and that, in any event, plaintiff's method of handling the problem was inappropriate. Ms. McPherron concluded by making three (3) suggestions to prevent similar friction in the future.
The second memo addressed, in a more general manner, alleged problems that plaintiff had with faculty, staff and students. Ms. McPherron's memo stated, in part:
We all feel that the problems can be solved, and are willing to commit time *464 and energy to their solution. We are willing to make this commitment because you are respected among your colleagues as a teacher who has maintained standards of excellence in the classroom and are admired by students as knowledgeable in and dedicated to your field.
The essence of the situation is that faculty feel you have isolated yourself to the extent that daily working relationships can not be maintained; staff feel that they have been perceived as hindering when trying to help; and students feel that they have been intimidated and threatened.
The memo recommended several actions to alleviate these alleged problems, such as maintaining a certain number of office hours, using anonymous student evaluations, and allowing Ms. McPherron to visit plaintiff's classroom. The memo concluded, as follows:
It is the intent of the recommendations to create structural changes which reduce physical barriers to social isolation and encourage social participation. These recommendations can only create conditions which [sic] more contact and, hopefully, better relationships. The willingness to do so is more important.
Dr. Harris concluded the meeting by requesting that all parties attempt to work together to resolve their existing problems.
15. In January, 1980, after having served the minimum period of three (3) years as an Assistant Professor, plaintiff applied for promotion to the rank of Associate Professor, for the academic year 1980-81. Eight (8) other Assistant Professors applied for promotion to Associate Professors at the same time. Seven (7) of the applicants were white and two (2) were black. Plaintiff and Ron Stutzman, a white male, were the only two (2) applicants with Ph.D.'s.
16. The Administrative Procedures regarding faculty advancement in rank had been periodically revised since their original implementation and, under the Administrative Procedures in effect in January, 1980, each applicant for promotion prepared and submitted his/her own application identifying prominent examples and illustrations of that individual's accomplishments in five (5) criteria for the years in current rank. These five (5) weighted criteria were: 1) teaching, instructional resources, and/or counseling effectiveness (60%); 2) professional growth and development (15%); 3) contributions to department and division activities (10%); 4) contributions to campus and college-wide activities (10%); and 5) contributions to the community (5%). Each of these five (5) criterion is defined and explained, with examples, in the Administrative Procedures. The applicant also had the opportunity to attach to the application for promotion any documents that may have a bearing on the consideration of their promotion.
Under the Administrative Procedures, applications for promotion are initially reviewed by the respective division promotion committee. Each division promotion committee consists of not less than three (3) nor more than five (5) full-time faculty members to be elected by the full-time divisional faculty for a one (1) year term. The president of the campus may add one (1) or two (2) members to any division committee in order to accomplish minority representation. Each division promotion committee prepares a composite evaluation summary for each candidate including a list of the applicant's most significant strengths and weaknesses. Copies of the strengths and weaknesses are forwarded to the campus promotion committee.
The campus promotion committee consists of the Dean of Instruction as non-voting chairperson, the Dean of Student Services as non-voting vice-chairperson, two (2) administrators appointed by the President of the campus and one (1) full time faculty member to be elected by the full-time faculty of each division.
After review of each application for promotion and the listing of the strengths and weaknesses done by the division promotion committees, the campus promotion committee prepares a composite evaluation of each applicant in accordance with the five (5) *465 criteria set forth in the Administrative Procedures. Copies of the Administrative Procedures setting forth these five (5) criteria and the explanatory comments contained therein are furnished to each member of the committee. The composite summaries are arranged in order of total promotion points and also contain a listing of strengths and weaknesses.
The Associate Dean of each division reviews the division committee evaluations and makes a recommendation for each applicant. The Associate Dean also furnishes each applicant with the division committee composite evaluation summary.
The Dean of Instruction also receives the evaluation reports of the Campus Committee. At that time the Dean prepares a recommendation for each applicant and forwards all materials to the president of the campus.
The president of the campus reviews the statements of strengths and weakness from the division committees, the composite summaries from the Campus Committee and the recommendations of the Associate Deans and Dean of Instruction. At that time the president of the campus prepares a recommendation for each applicant and forwards all materials to the Chancellor.
The Chancellor, after consultation with the president of each campus, will submit to the Board of Trustees the names of those candidates recommended for promotion.
17. The division promotion committee of the Human Services Division ranked plaintiff fourth of the five (5) applicants from Human Services. The division promotion committee consisted of four (4) white and one (1) black members. Plaintiff received a score of 856. Among the weaknesses of plaintiff, summarized by the division promotion committee, were the following: "1. Talks above students head. Several years show no peer or supervisory classroom visits at all. I seriously question having students put names on class evaluation forms."; "2. No indication of any conferences attended, papers presented, etc."; "3. Many of the jobs done are part of staffs' expected duties."; "4. Needs more varied involvement."
18. Of the nine (9) applicants for promotion to the rank of Associate Professor, plaintiff was ranked eighth by the campus promotion committee. The campus promotion committee consisted of nine (9) members of which seven (7) were white and two (2) black. Plaintiff received a score of 804.44. Barbara Hunt, a black female applicant for Associate Professor, ranked last with a score of 799.03. Among the weaknesses of plaintiff, summarized by the campus promotion committee, were the following: 1) "Requiring names on [evaluations] seems that it might slant comments"; 2) "More participation on college committees needed"; 3) "Names on some student evaluations. No student evaluations or supervisors' evaluations before 1975. Students at times felt she talked over their heads."; 4) "[Under `Contributions to Campus/College Activities' category:] Needs more varied involvement. Normal participation only"; 5) "Collecting signed evaluations of teaching"; 6) "Mostly involved with black committees  may need to broaden range."
19. Of the nine (9) applicants for promotion to Associate Professor, all applicants were recommended for promotion by the Associate Dean of their respective division except plaintiff. Barbara Hunt was recommended by her Associate Dean.
20. Of the nine (9) applicants for promotion to Associate Professor, four (4), including plaintiff, were not recommended for promotion by Betty Duvall, Dean of Instruction. Barbara Hunt was recommended for promotion by Ms. Duvall. Two (2) white applicants with higher campus promotion committee scores than plaintiff (819.44 for Joan Burns and 813.33 for Walter Floser), were not recommended for promotion by Ms. Duvall.
21. After review by the President of the Florissant Valley Campus, five (5) of the nine (9) applicants were recommended for promotion by President Harris. Plaintiff and Barbara Hunt were not recommended. President Harris did not recommend two *466 (2) white applicants with higher campus committee scores than plaintiff.
22. Ms. McPherron did not recommend plaintiff for promotion because of the low rank plaintiff had received in the division committee, her use of signed student evaluations, student complaints, the mediocrity of plaintiff's committee memberships, and the fact that Ms. McPherron had not observed plaintiff's class.
23. Dean of Instruction Duvall did not recommend plaintiff for promotion because of the low rank plaintiff had received in both the division committee and the campus committee, the fact that she was not recommended by her Associate Dean, and also the use of signed student evaluations.
24. President Harris did not recommend plaintiff for promotion because of the low rank plaintiff had received in both the division committee and the campus committee, the fact that she was not recommended by her Associate Dean and the Dean of Instruction, and the use of signed student evaluations.
25. The decisions of McPherron, Duvall and Harris not to recommend plaintiff for promotion were for legitimate non-discriminatory reasons.
26. The written memorandum from Ms. McPherron to Ms. Duvall, stating that Ms. McPherron did not recommend plaintiff for promotion, was dated April 3, 1980. The non-recommendation memoranda of Ms. Duvall and President Harris were dated March 20, 1980, and April 2, 1980, respectively. However, Ms. McPherron had orally communicated her non-recommendation of plaintiff to Ms. Duvall and President Harris prior to March 20, 1980.
27. By letter dated May 15, 1980, Richard K. Greenfield, Chancellor of St. Louis Community College, advised plaintiff that he would not be recommending her for promotion to Associate Professor. Similar letters were sent to the other three unsuccessful applicants for promotion to Associate Professor. In all, five (5) of the nine (9) applicants were promoted to Associate Professor. Barbara Hunt was not promoted. All five (5) of the individuals who were promoted to Associate Professor were white. Two (2) black applicants were not promoted.
28. The following year, Barbara Hunt reapplied for promotion to Associate Professor and, after review and evaluation by the appropriate promotion committees and administrative personnel, was granted promotion to Associate Professor. Plaintiff has not reapplied for promotion to Associate Professor.
29. At the time of plaintiff's promotion application, all continuing full-time faculty with Ph.D.'s, and who otherwise met qualifying criteria, held the rank of Associate or full Professor. President Harris testified that a Ph.D. is only one consideration, among many, in making the promotion decision.
30. Since the implementation of promotion committees for use in the process of faculty promotion, there have been thirty-six (36) different applications by minority faculty members for promotion to Assistant, Associate and Full Professor. Of those 36 different applications, twenty-nine (29) have been granted the promotion sought. During that same period of time, there have been three hundred and two (302) different applications by non-minority faculty members for promotion to Assistant, Associate or Full Professor. Of those 302 applications, 103 have been granted the promotion sought. Under the committee system 80% of minorities, as opposed to 34% of non-minorities, have successfully applied for promotion.
31. During the years 1978-83, for all campuses and all ranks, the percentages of successful minority and non-minority applicants for promotion were, as follows:

*467
 Minority Minority % Non-Minority Non-Minority %
 Applicants Promotions Promoted Applicants Promotions Promoted
 1978/79 12 9 75% 89 69 77%
 1979/80 11 11 100% 57 38 66%
 1980/81 5 3 60% 41 22 54%
 1981/82 5 3 60% 32 18 56%
 1982/83 3 3 100% 47 36 77%
 _______ ________ ________ ________ _______ _______
 Total 36 29 80% 266 183 69%

32. During the years 1978-83, for the Florissant Valley Campus only and all ranks, the percentages of successful minority and non-minority applicants for promotion were, as follows:

 Minority Minority % Non-Minority Non-Minority %
 Applicants Promotions Promoted Applicants Promotions Promoted
 1978/79 5 5 100% 34 26 76%
 1979/80 2 2 100% 26 14 54%
 1980/81 4 2 50% 19 9 47%
 1981/82 2 1 50% 9 4 44%
 1982/83 2 2 100% 13 7 54%
 ________ _______ _______ ________ _______ ______
 Total 15 12 80% 101 60 59%

33. During the years 1978-83, for the Florissant Valley Campus only and the rank of Associate Professor only, the percentages of successful minority and non-minority applicants for promotion to Associate Professor were, as follows:

 Minority Minority % Non-Minority Non-Minority %
 Applicants Promotions Promoted Applicants Promotions Promoted
 1978/79 1 1 100.0% 10 8 80%
 1979/80 1 1 100.0% 7 4 57%
 1980/81 2 0 0% 7 5 71%
 1981/82 2 1 50.0% 2 2 100%
 1982/83 2 2 100.0% 2 0 0%
 _______ ________ ________ _______ _______ ______
 Total 8 5 62.5% 28 19 73%

34. Ms. McPherron became Associate Dean of the Human Services Division in July, 1978. Ms. McPherron participated in the promotion process, as Associate Dean, during the years 1979-83. Considering all ranks, the percentages of successful minority and non-minority applicants for promotions in the Human Services Division were, as follows:

 Minority Minority % Non-Minority Non-Minority %
 Applicants Promotions Promoted Applicants Promotions Promoted
 1979/80 2 1 50% 5 3 60%
 1980/81 1 0 0% 3 3 100%
 1981/82 0 0 0% 2 1 50%
 1982/83 1 1 100% 2 1 50%
 _______ ________ ________ ________ _______ _______
 Total 4 2 50% 12 8 66%

*468 35. The committee evaluation process for promotions does not fall more heavily on minorities than non-minorities in any significant manner.
36. The scoring by the campus promotion committee was not uniform. Plaintiff was evaluated by all nine (9) members in all five (5) criteria. Joan Burns, a white female who was ranked sixth and was not promoted; Carol Bear, a white female who was ranked fifth and was promoted; and Walter Floser, a white male who was ranked seventh and was not promoted, were evaluated by all nine (9) members in all five (5) criteria.
Several applicants, however, were not evaluated by all nine (9) members in all five (5) criteria. Most notably, Ron Stutzman, a white male who was ranked third and was promoted, was evaluated by eight (8) members in four (4) criteria and by six (6) members in one (1) criteria. Tom Mines, a white male who was ranked first and was promoted; Brian Gordon, a white male who was ranked second and was promoted; and Al Byington, a white male who was ranked fourth and was promoted, were all evaluated by nine (9) members in four (4) criteria and by eight (8) members in one (1) criteria. Barbara Hunt, a black female who was ranked ninth and was not promoted, was evaluated by nine (9) members in four (4) criteria and by eight (8) members in one (1) criteria.
No explanation was offered for these apparent deviations, but they are not probative on the question of discrimination. Two (2) non-minorities who ranked above plaintiff were scored in the same manner as plaintiff. A minority who ranked below plaintiff was not scored in the same manner as plaintiff. There was no evidence that plaintiff would have ranked higher if all applicants were scored on all criteria by all campus promotion committee members.
37. On or about October 12, 1979, plaintiff submitted a request for sabbitical leave for the 1980-1981 academic year.
38. Under the Administrative Procedures in effect at that time, a faculty member prepares his/her own sabbatical leave application. The sabbatical leave application is to include a comprehensive statement which emphasizes the objectives of the proposed leave and the activities which will be carried out to achieve these objectives.
Each application is initially evaluated by a campus sabbatical leave committee on five (5) stated criteria on a scale of one (1) (low) to ten (10) (high) and the sabbatical leave committee also provides evaluative comments.
Following review by the sabbatical leave committee, the respective Associate Dean, the Dean of Instruction and the President of the campus make appropriate recommendations. Thereafter, the President of the campus will recommend to the Chancellor the sabbatical leave applications for approval. The names of the sabbatical leave applicants not recommended by the campus president for approval are not forwarded to the Chancellor.
The number of sabbatical leaves that can be granted by each campus is limited to six (6) per year.
39. The sabbatical leave committee at Florissant Valley in 1979-1980 was comprised of nine (9) voting members, eight (8) white individuals and one (1) black individual.
40. The sabbatical leave proposal submitted by plaintiff requested a one (1) year sabbatical leave to delineate variables associated with student attrition, identify students who appear unlikely to complete a course of study at St. Louis Community College at Florissant Valley, to develop a motivation training program and institute a motivation training program. In her proposal plaintiff stated that, at a minimum, this proposal would require a secretary, two (2) research assistants, two (2) non-professional training assistants, one (1) professional assistant and a computer technician. Plaintiff's proposal was supported by endorsements by faculty members, including Stanley Kary, her department chairperson at the time.
*469 41. Prior to submission of this sabbatical proposal, plaintiff did not make any inquiry or determine how much a psychologist would charge nor had she investigated the total cost of the sabbatical.
42. There were fourteen (14) applicants for sabbatical leave at Florissant Valley during the 1979-1980 academic year.
43. Of those fourteen (14) applicants, the sabbatical leave application submitted by plaintiff was ranked eighth by the sabbatical review committee.
44. Plaintiff's sabbatical proposal was not recommended by Associate Dean McPherron because the proposal requested resources far beyond that usually associated with a sabbatical leave and there was not adequate resources to support the project as proposed. Associate Dean McPherron suggested various ways in which the sabbatical proposal could be modified.
45. By letter dated December 10, 1979, David Harris advised plaintiff that he was not recommending her sabbatical proposal to the Chancellor. David Harris encouraged plaintiff to focus on one (1) or two (2) high priority issues and then check external funding in support of the project. In addition, David Harris requested that plaintiff explore district-wide interrelated efforts through the institutional research office.
46. David Harris did recommend the sabbatical leave proposal by Jack Ballinger to pursue doctoral studies toward a Doctor of Psychology Degree in Vocational Education. Jack Ballinger is a white male and was tied with plaintiff on points. This proposal was important because the funding to the College by the State of Missouri is based upon the number of qualified individuals in the vocational education department.
47. The decisions of Ms. McPherron and President Harris not to recommend plaintiff's 1979 sabbatical proposal were for legitimate, non-discriminatory reasons.
48. Of the six (6) successful applicants for sabbatical leave in 1979-1980, five (5) were white and one (1) was black.
49. On or about October 12, 1981, plaintiff submitted a request for sabbatical leave for the Fall 1982 semester.
50. Prior to submission of this second sabbatical leave request, plaintiff did not consult with any other individual at Florissant Valley to determine how her original sabbatical proposal could be modified.
51. In addition, prior to submission of this second sabbatical leave request, plaintiff did not check external funding in support of her original proposal nor did she explore district-wide interrelated efforts through the institutional research office as suggested by President Harris.
52. The second sabbatical leave proposal submitted by plaintiff requested a one (1) semester sabbatical leave to conduct library research in areas of motivation and cognitive processes.
53. There were eleven (11) applicants for sabbatical leave at Florissant Valley during the 1981-1982 academic year.
54. Of those eleven (11) applicants, the sabbatical leave application by plaintiff was ranked tenth by the sabbatical review committee.
55. By letter dated November 24, 1981, David Harris advised plaintiff that he was not recommending her sabbatical proposal to the Chancellor.
56. David Harris did not recommend plaintiff's second proposal after review of the analysis and evaluation performed by the sabbatical leave committee and also because David Harris felt that the library research proposed by plaintiff was such that should normally be undertaken by a faculty member in the course of preparing their application for sabbatical leave.
57. The decision of David Harris not to recommend plaintiff's second sabbatical proposal was for a legitimate, non-discriminatory reason.
58. Plaintiff presented evidence of several instances of "harassment," including *470 inter alia: 1) requiring plaintiff to submit written explanations for her absence from faculty meetings; 2) permitting secretarial employees to be rude to plaintiff; 3) imposing "extra" duties on plaintiff; 4) denying plaintiff a pay increase upon completion of her doctorate; 5) denying plaintiff's requests for extended time to prepare new course proposals; 6) denying plaintiff released time to write a column for "Dear Psychologist"; 7) refusal to pay the cost for plaintiff to attend seminars; 8) assigning plaintiff to teach an "overload" schedule; and 9) requiring plaintiff to be on campus five (5) days a week. None of these constituted harassment. None of these were racially discriminatory.
59. Theresa Jablonski Polk, an Assistant Professor in Human Services at Florissant Valley, testified that on one occasion, Ms. McPherron told Ms. Polk that Ms. Polk was wearing her sandals the way "black people" do. Ms. Polk also testified that there was so little personal interaction between herself and plaintiff, that Ms. Polk asked plaintiff if she had ever done anything to offend plaintiff.
60. Judy Newsham, a former secretary in the Human Services Division at Florissant Valley, testified that Ms. McPherron asked her to report on the activities of certain individuals, including plaintiff. These individuals included both minorities and non-minorities.
61. On May 15, 1980, plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC). The EEOC, on July 24, 1981, determined that there was reasonable cause to believe that plaintiff was denied a promotion on account of her race. The EEOC determined that "the harassment allegation is not supported by the evidence and that the terms and conditions of employment are untimely."

B. CONCLUSIONS OF LAW
This Court has jurisdiction of this case pursuant to 28 U.S.C. § 1343 and 42 U.S.C. § 2000e-5(f)(3).
In a Title VII cause of action, the plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. If the plaintiff is successful, the defendant must then articulate a legitimate non-discriminatory reason for its actions. In order to sustain this burden, the defendant only need present evidence which raises a genuine issue of fact as to whether it discriminated against the plaintiff. The burden of producing evidence then shifts back to the plaintiff, who must show by a preponderance of the evidence, that the defendant's explanation was merely a pretext for discrimination within the meaning of the statute. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); McDonnell Douglas Corporation v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Coleman v. Missouri Pacific Railroad Company, 622 F.2d 408 (8th Cir.1980); Kirby v. Colony Furniture Company, Inc., 613 F.2d 696 (8th Cir.1980); Meyers v. I.T.T. Diversified Credit Corporation, 527 F.Supp. 1064 (E.D.Mo.1981). Once the defendant responds to the plaintiff's proof by offering evidence of the reason for its actions, the presumption "drops from the case" and the court must then determine whether there was discrimination within the meaning of Title VII. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). The ultimate "`factual inquiry' in a Title VII case is `whether the defendant intentionally discriminated against the plaintiff'." United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 103 S.Ct. at 1482 citing Texas Department of Community Affairs v. Burdine, 450 U.S. at 248, 253, 101 S.Ct. at 1093-94 (1981). The plaintiff always retains the burden of persuasion with respect to this ultimate factual issue. The division of intermediate evidentiary burdens serves merely to allow the court to evaluate more easily the evidence as it bears on the critical issue of discrimination. Id. The substantive analysis of plaintiff's claims under § 1981 is essentially *471 the same as that under Title VII. New York City Transit Authority v. Beazer, 440 U.S. 568, 99 S.Ct. 1355, 59 L.Ed.2d 587 (1979); McDonald v. Santa Fe Trail Transportation Co., 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).
The elements of a prima facie case in a Title VII cause of action vary according to the particular claim that a plaintiff asserts. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 1824 n. 13, 36 L.Ed.2d 668 (1973). On plaintiff's denial of promotion claim, she asserts both disparate treatment and disparate impact as a basis for recovery. On her denial of sabbatical claims, and her harassment and retaliation claims, plaintiff relies solely on a disparate treatment theory. Disparate treatment occurs where "[t]he employer simply treats some people less favorably than others because of their race." International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). Disparate impact "involves[s] employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." Id. See Jones v. International Paper Co., 720 F.2d 496 at 499 (8th Cir.1983).
In the context of promotions, a prima facie case of disparate treatment requires plaintiff to show: 1) she is a member of a protected class; 2) she applied for and was qualified for the promotion in question; 3) she was not promoted; and 4) the promotion was filled by someone with similar qualifications. Burrows v. Chemed Corp., 567 F.Supp. 978, 984 (E.D.Mo.1983). See also Wells v. Gotfredson Motor Co., Inc., 709 F.2d 493 (8th Cir.1983). A similar analysis applies in the context of plaintiff's request for sabbaticals.
To establish a prima facie case of disparate impact, plaintiff must show "that a facially neutral employment practice actually operates to exclude from a job a disproportionate number of members of a protected class." Hawkins v. Anheuser-Busch, Inc., 697 F.2d 810, 815 (8th Cir. 1983). "A subjective decision-making system cannot alone form the foundation for a discriminatory impact case." Harris v. Ford Motor Co., 651 F.2d 609, 611 (8th Cir.1981).
Applying the above principles to the facts of this case, it is the opinion of this Court that plaintiff made out a prima facie case of disparate treatment. Nevertheless, defendants proved that plaintiff was denied a promotion and two (2) sabbaticals for legitimate, non-discriminatory reasons. See Findings of Fact Nos. 25, 47, 57. Plaintiff did not prove that these reasons were pretextual. The same is true of plaintiff's allegations of harassment and retaliation. See Finding of Fact No. 58. Although there was testimony from one witness which implicated the issue of race, see Finding of Fact No. 59, that testimony does not support a finding that defendants' asserted justifications were pretextual.
Plaintiff also made out a prima facie case of disparate impact. This is supported by the fact that there were nine (9) applicants for promotion to Associate Professor, of whom two (2) were minorities, and no minority was promoted. See Finding of Fact No. 27. The finding of the EEOC also supports this conclusion, see Finding of Fact No. 61, and that finding is entitled to deference. Bell v. Bolger, 708 F.2d 1312, 1321 (8th Cir.1983). However, again defendants convincingly rebutted plaintiff's proof. The statistics established by defendants' evidence demonstrate that the facially neutral evaluation procedures utilized by defendants do not weigh more heavily on minorities than non-minorities. See Findings of Fact Nos. 30 through 35. More often than not, minorities are promoted at a higher rate than non-minorities. Plaintiff's proof and the EEOC determination are not entitled to much weight because nine (9) applicants is not an adequate sample size. International Brotherhood of Teamsters v. United States, 431 U.S. 324, 340 n. 20, 97 S.Ct. 1843, 1856-57 n. 20, *472 52 L.Ed.2d 396 (1977); Bell v. Bolger, 708 F.2d 1312, 1321 (8th Cir.1983).
It is true that subjective criteria and professional judgment may serve as tools for discrimination, Bell, 708 F.2d at 1319-20, but the need for discretion is paramount in the field of higher education. The criteria utilized by defendants' evaluation system are sufficiently defined. See Findings of Fact No. 16. That these criteria have not been used as tools for discrimination is established by defendants' statistical evidence. See Findings of Fact Nos. 30 through 35.
A great deal of evidence was presented in this case concerning various "incidents" involving plaintiff and her superiors. After listening to many days of testimony concerning these "incidents", this Court is left with the firm conviction that both plaintiff and her superiors, especially Ms. McPherron, have had strong personality conflicts. Personality conflicts and dissatisfaction with the decisions of one's superiors, however, do not rise to the level of a federal cause of action. In the case at bar, this Court is of the opinion that the decisions of plaintiff's superiors were disassociated from race.

ORDER AND JUDGMENT
Pursuant to the Memorandum filed herein this day,
IT IS HEREBY ORDERED, ADJUDGED and DECREED that judgment be and is entered in favor of defendants on plaintiff's complaint and that plaintiff's complaint be and is dismissed.