610 F.Supp. 1120 (1985)
David B. WASHINGTON, Plaintiff,
v.
DAYTON HUDSON CORPORATION, Defendant.
No. 83-1584C(1).
United States District Court E.D. Missouri, E.D.
June 6, 1985.
*1121 David B. Washington, pro se.
Edward J. Griesedieck, George J. Bude, St. Louis, Mo., for defendant.

MEMORANDUM
NANGLE, Chief Judge.
Plaintiff David B. Washington brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. Plaintiff alleges that he was discharged from employment with defendant on account of his race and that he was denied a promotion and treated differently than similarly situated white employees on account of his race.
This case was tried to this Court sitting without a jury. This Court having considered the pleadings, the testimony of the witnesses, the documents in evidence, and the stipulations of the parties, and being fully advised in the premises, hereby makes the following findings of fact and conclusions of law, as required by Rule 52 of the Federal Rules of Civil Procedure. Fed.R.Civ.P. 52.

A. FINDINGS OF FACT
1. Plaintiff David B. Washington is a black male resident of the State of Missouri and was at all times relevant herein a citizen of the United States.
2. Defendant Dayton Hudson Corporation owns Target Stores, a retail department store chain which has several stores in the St. Louis area.
3. Plaintiff was employed by Target Stores from May 1, 1977 through February 28, 1983. He was originally employed at the Target Store located in University City, Missouri, and was promoted in April, 1981, to the position of Total Store Merchandise Manager at the Target Store located in *1122 Kirkwood, Missouri. Both University City and Kirkwood are municipalities located in St. Louis County, Missouri.
4. As the Total Store Merchandise Manager, plaintiff held the second highest position in the store, next to the Store Manager. His duties included responsibility for total store merchandising, setting up and maintenance of store sales areas and the stock room, display, ordering and replenishing merchandise, and supervising department managers. There were eight (8) department managers under plaintiff's supervision. Seven (7) of these managers were white and one (1) was black.
5. Prior to January 1, 1983, the Kirkwood Store Manager was Jim Cisco, a white male. Plaintiff reported directly to Mr. Cisco, as did Bill Meyers, a white male and Operations Manager. In addition to plaintiff and Bill Meyers, Vicki Wainz, a white female and Personnel Coordinator for the Kirkwood store, also reported directly to the Store Manager. Miss Wainz was responsible for time cards, time card maintenance and calculations, payroll and record keeping, and training of employees. Defendant's Regional Personnel Manager was Connie Lindemann, a white female. Gary White, a black male, was the District Manager for the district in which the Kirkwood Target Store was located.
6. During the period that plaintiff was stationed at the University City store, plaintiff received good performance reviews and was commended for taking on extra duties.
7. Upon his arrival at the Kirkwood store, plaintiff met with the Store Manager, Mr. Cisco, to discuss several problems that existed at the store and to formulate a plan to solve those problems. Among the problems at the Kirkwood store were poor merchandising standards and poor employee discipline. Part of the plan arrived at by plaintiff and Mr. Cisco consisted of plaintiff conducting weekly tours of different areas of the store, taking notes on the conditions therein and giving said notes to the various department managers. Approximately six months after plaintiff arrived at the Kirkwood store, several department managers went to Mr. Cisco and complained to him that they found plaintiff's management style threatening. Mr. Cisco reported this to plaintiff and at that time Mr. Cisco recommended that plaintiff continue with the agreed upon plan. Later, plaintiff was directed to cease taking notes on his department stores.
8. On August 31, 1981, plaintiff received his mid year performance review. It was completed by Mr. Cisco and plaintiff signed it. Among the weaknesses listed therein were that plaintiff over-delegated responsibility, polarized personalities, and was insensitive to his subordinate's needs. Under the section entitled "Goals, Objectives Or Position Responsibilities Not Attained As Agreed Upon", were the following entries: 1) "Store housekeeping and zone defense standards inconsistent and at times unsatisfactory"; and 2) "Stockrooms not maintained daily in organized fashion". These criticisms were true. On this review, plaintiff received an overall rating of "S", or satisfactory.
9. On March 25, 1982, plaintiff received his annual performance review. It was signed by both plaintiff and Mr. Cisco. Under the heading of "Goals, Objectives Or Position Responsibilities Not Attained", were the following entries: 1) "Sales floor, stockroom standards not consistently maintained, at times excellent, at times substandard"; and 2) "Effective management of people, sensitive to needs, two way communication". Under the heading of "Supervisor's Comments" and the subheading entitled "Development Needs", were the following:
1. Authoritarian style and effort to resolve tasks has led to a perception of insensitivity to subordinates by subordinates. It is noted that this problem has been serviced and addressed in an effort for resolution. Improvement is being demonstrated.
2. At times gives incorrect responses when facts are unknown.

*1123 3. Use of check list to inforce [sic] standards impairs two-way communication: at times common sense does not prevail.
These criticisms were true. Under the heading "Career Development Plans", the following entry was made: "Continue to develop a personal style of management that addresses people needs as well as task accomplishment." In addition, Mr. Cisco stated in the review that plaintiff was ready for promotion to a "C" Store Manager in June, 1982. Plaintiff's overall score, out of a possible score of 100, on this review was 63.
10. In June, 1982, there was a Store Manager opening at the Target Store in Alton, Illinois. Plaintiff was not given this promotion. Rex Cheek, an American Indian, was given the position. His score on his March, 1982, performance review was 69. Rex Cheek was given the position due to his higher score.
11. The entry in plaintiff's March, 1982 performance review that he was ready for promotion in June, 1982, was merely a recommendation by Mr. Cisco. Mr. Cisco had no authority to promote plaintiff to the position of Store Manager at another store. Only Gary White, the District Manager, and Connie Lindemann, the Regional Personnel Coordinator, had the authority to promote an individual to Store Manager. Plaintiff's testimony that he believed that Mr. Cisco could promote him to Store Manager was not credible.
12. On August 21, 1982, plaintiff received an "Executive Mid-Year Performance Review". It was signed by Mr. Cisco and plaintiff. Under the heading "Goals, Objectives Or Position Responsibilities Not Attained As Agreed Upon", were the following two entries: 1) "Stock room maintenance inconsistent"; and 2) "Zone defense inconsistent". Under the heading of "Summary of Job Related Strengths And Development Needs" and the subheading "Weaknesses" were the following:
1. At times drops total store concern causing performance lapses at front lane/service desk operation.
2. Lack of consistency in own and subordinates work level causing performance lapses that effect the total store appearance and sales result. A high level of consistency incorporating store, district and company programs is required to successfully manage a Target Store.
These criticisms were true.
13. On September 1, 1982, plaintiff sent a memo to his department managers in which he essentially blamed them for the comments and the developmental needs/weaknesses section of his mid year review. As a result, plaintiff received a memorandum from Gary White stating that plaintiff's memorandum to his department managers was "totally out of order and unprofessional, as well as, poor use of management supervision skills." Gary White demanded that plaintiff apologize to his department managers. Plaintiff did apologize to his department managers in writing on September 15, 1982, as follows:
The memo was not done in a professional manner and I consider it out of order as well as a poor use of management supervision skills. Problems that relate to my performance review should not be a group issue. I should have discussed individual developmental needs pertaining to specific merchandising standards. I feel that each of you deserves an apology in writing and in person. My results orientated nature should not replace interpersonal skills.
14. During the summer and fall of 1982, several store tours by plaintiff's superiors turned up several deficiencies in merchandising practices for which plaintiff was responsible. For example, in a memorandum dated September 10, 1982, from Mr. Cisco to plaintiff, Mr. Cisco stated, as follows:
As we have discussed in the past and again today, [the Kirkwood Target Store] has a need for more awareness and attention to the basic part of merchandising: more specifically planogram maintenance, in-stock position, assuring that items out on the sales floor are pulled from the stockroom, signing, sample tagging and consistent high level of zoning. *1124 The past several tours have not been good. The last tour with Mark Dawkins was acutely embarrassing with the hardware planogram not complete, sales floor outs with like merchandise in the stockroom, and signing.
You must be aware that this level of performance cannot continue. I expect immediate improvement in the items mentioned above, and a commitment from you that reoccurrences will not happen again.
In a responsive memorandum dated October 22, 1982, plaintiff stated that he "had profound guilt feeling that [his] merchandising skills were substandard." On November 10, 1982, Mr. Cisco sent plaintiff a memorandum concerning the stockroom problem which stated, as follows:
The Fire Marshall responded to one of our employees who made several complaints about the conditions of our stockrooms regarding fire safety.
Several fire exits were blocked. This has been discussed in the past, and has been a topic on the weekly security activities report.
Needless to say, this will not be allowed to continue. The standard is for no fire exits to be blocked at any time.
In addition, a program that was designed to make sure that the store's sales stock was replaced promptly, known as the "White Dot" program, was not being implemented.
15. Target Stores employed a two step industrial due process procedure. Under the first step, a "Phase I Warning Notice" was given to the employee. This notice consisted of three sections: 1) "Problem Definition"; 2) "Improvement Required"; and 3) "Suggested Improvement Method". A time period was established within which the company's requirements were to be met and the failure to meet said requirements within the specified date resulted in the issuance of a "Phase II Warning Notice". A Phase II Warning Notice also gave the employee a deadline to comply with company requirements, but the failure to so comply would result in termination.
16. On November 27, 1982, plaintiff received a Phase I Warning Notice. The problem was defined as "failure to follow instructions/unsatisfactory work performance". Plaintiff was given until December 27, 1982, to meet the company's requirements. The warning was signed by Mr. Cisco, but plaintiff refused to sign it. The problem was defined in more detail, as follows:
1. White Dot program not implementedagreed date 11-12-82.
2. Stockroom not to agreed standards on agreed date 11-12-82.
3. Inappropriate communication resulting in subordinates feeling threatened and intimidated.
4. Due to overspending payroll and merchandising, the store has not made payroll standard YTD.
The notice further detailed the nature of the improvements that were required and suggested a detailed method for achieving said improvements. Attached to the last page of the Phase I Warning Notice was a note by Mr. Cisco memorializing an oral discussion held between plaintiff and Mr. Cisco on October 29, 1982, in which Mr. Cisco advised plaintiff of his dissatisfaction with the White Dot program and the condition of the stockrooms. At that meeting, plaintiff was directed to resolve these problems by November 12, 1982.
17. By the end of the Phase I Warning Notice period, plaintiff had made little improvement. On December 29, 1982, Mr. Cisco issued a Phase II Warning Notice to plaintiff, which notice plaintiff refused to sign. This notice essentially restated the problem, the improvement required, and the suggested method for improvement. The problem concerning his relationships with his subordinates was elaborated on as follows: "Subordinates, peers, and others feel intimidated by your comments and actions; ...."
18. On January 1, 1983, Jim Cisco left the employment of defendant for medical reasons and was replaced as Kirkwood Store Manager by Stan Schwede, a white male. Mr. Schwede had numerous meetings *1125 with plaintiff during the month of January, 1983, in connection with plaintiff's Phase II Warning Notice, constantly reminding him about the items plaintiff needed to accomplish and lending his assistance in the way of suggestions and counsel. However, plaintiff was unable to meet the deadlines given to him with regard to improvement in the stockroom and maintenance of the sales areas, including the replenishment of stock under the White Dot program.
19. At the end of the Phase II Warning period, on or about January 29, 1983, at plaintiff's request, his Phase II Warning Notice was extended an additional thirty (30) days so that the new Store Manager would have a better opportunity to evaluate plaintiff's performance. Thus, his Phase II Warning Notice period was extended to February 28, 1983. The Phase II Warning Notice extending the period to February 28, 1983, was signed by both Mr. Schwede and plaintiff.
20. On January 18, 1983, it came to Mr. Schwede's attention that plaintiff had failed to immediately respond to a burglar alarm call at 4:28 a.m. on December 26, 1982. Plaintiff did not respond until approximately five (5) hours later at 9:02 a.m. Plaintiff's explanation was that he fell back asleep.
21. Although Mr. Schwede had numerous meetings with plaintiff during the month of February, 1983, and plaintiff made numerous promises with respect to deadlines, plaintiff was unable to meet said deadlines and to satisfy the requirements of the Phase II Warning Notice. On February 28, 1983, Mr. Schwede terminated plaintiff with the concurrence of the District Manager and the Regional Personnel Supervisor.
22. Plaintiff was replaced with a black female named Janice Jamieson who continued in the position of Total Store Merchandise Manager until November, 1984, when she voluntarily left defendant's employ for personal reasons.
23. Several employees of the Kirkwood Target Store made statements of a racial nature about plaintiff. However, these statements were not brought to the attention of the Store Manager, the District Manager or the Regional Personnel Supervisor. In addition, the persons making the statements did not have authority to make any decisions concerning plaintiff's working conditions.
24. Plaintiff was not denied a promotion on the basis of race.
25. Defendant's decision to terminate plaintiff was not based on race or affected in any way by any racial bias on the part of any subordinate employee at the Kirkwood Target Store.
26. Defendant did not fail to give plaintiff support in his position as Total Store Merchandise Manager.
27. The plaintiff was not treated differently than other white managers, plaintiff was not subjected to harassment, and no action taken with respect to plaintiff by defendant was based in any part on plaintiff's race.

B. CONCLUSIONS OF LAW
This Court has subject matter jurisdiction of this case pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3). Defendant is an employer as defined in 42 U.S.C. § 2000e(b).
In a Title VII cause of action, plaintiff has the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination. If plaintiff is successful, defendant must then articulate a legitimate non-discriminatory reason for its actions. In order to sustain this burden, defendant need only present evidence which raises a genuine issue of fact as to whether it discriminated against plaintiff. The burden of producing evidence then shifts back to plaintiff, who must show by a preponderance of the evidence, that defendant's explanation was merely a pretext for discrimination within the meaning of the statute. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *1126 McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); Coleman v. Missouri Pacific Railroad Co., 622 F.2d 408 (8th Cir.1980); Kirby v. Colony Furniture Co., Inc., 613 F.2d 696 (8th Cir.1980); Walton v. St. Louis Community College, 583 F.Supp. 458 (E.D. Mo.1984). Once defendant responds to plaintiff's proof by offering evidence of the reason for its actions, the presumption "drops from the case" and the Court must then determine whether there was discrimination within the meaning of Title VII. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). The ultimate "`factual inquiry' in a Title VII case is `whether the defendant intentionally discriminated against the plaintiff'." Id. at 715, 103 S.Ct. at 1482 citing Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Plaintiff always retains the burden of persuasion with respect to this ultimate factual issue. The division of intermediate evidentiary burdens serves merely to allow the court to evaluate more easily the evidence as it bears on the critical issue of discrimination. Id.
The elements of a prima facie case in a Title VII cause of action vary according to the particular claim that a plaintiff asserts. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 1824 n. 13, 36 L.Ed.2d 668 (1973). On all of plaintiff's claims herein he asserts disparate treatment as a basis for recovery. Disparate treatment occurs where "[t]he employer simply treats some people less favorably than others because of their race." International Brotherhood of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977). In the context of promotions, a prima facie case of disparate treatment requires plaintiff to show: 1) he is a member of a protected class; 2) he applied for and was qualified for the promotion in question; 3) he was not promoted; and 4) the promotion was filled by someone with similar qualifications. Burrows v. Chemed Corp., 567 F.Supp. 978, 984 (E.D.Mo.1983). See also Wells v. Gotfredson Motor Co., Inc., 709 F.2d 493 (8th Cir.1983). In the context of terminations, a prima facie case of disparate treatment requires plaintiff to show: 1) he was a member of a protected class; 2) he was capable of performing the job; and 3) he was discharged from the job. Johnson v. Bunny Bread Company, 646 F.2d 1250, 1253 (8th Cir.1981).
Plaintiff claims that he was discriminated against on the basis of his race in that he was denied a promotion, he was subjected to harassment, and he was terminated. In the opinion of this Court, plaintiff failed to establish a prima facie case with respect to any of these claims. On his promotion claim, plaintiff did not prove that the promotion in question was filled by someone with similar qualifications. The Store Manager position at the Alton, Illinois store was filled by an individual, also a minority, with a higher mid-year performance evaluation score than plaintiff. See Findings of Fact No. 10. Alternatively, assuming plaintiff established a prima facie case of discriminatory denial of promotion, the other applicant's higher evaluation score was a legitimate non-discriminatory reason for not promoting plaintiff. Moreover, plaintiff did not prove that defendant's reliance on the other applicant's higher score was pretextual or that plaintiff's race had even the slightest affect on defendant's failure to promote plaintiff. See Findings of Fact No. 24.
It is also the opinion of this Court that plaintiff failed to establish a prima facie case of discriminatory discharge. The evidence was overwhelming that plaintiff was not performing his job properly and that he was given many opportunities to correct the situation. See Findings of Fact Nos. 12, 13, 14, 16, 17, 18, 19, 20, and 21. Alternatively, assuming that plaintiff's evidence established a prima facie case of discriminatory discharge, plaintiff's failure to meet defendant's work requirements was a legitimate non-discriminatory *1127 reason for his discharge. Id. Moreover, plaintiff did not establish that said reason was pretextual or that plaintiff's race played any part in defendant's decision to terminate plaintiff. See Findings of Fact No. 25. Defendant did not fail to give plaintiff the support he needed to perform his job properly. See Findings of Fact No. 26.
Finally, it is the opinion of this Court that plaintiff was not treated any differently, harassed or subjected to any action by defendant on the basis of his race. See Findings of Fact No. 27. Evidence concerning racial statements by plaintiff's co-workers or subordinates does not taint the legitimacy of defendant's actions, because said statements were never brought to the attention of plaintiff's superiors and the individuals who made such statements had no authority to make decisions concerning plaintiff. See Findings of Fact No. 23. Although plaintiff handled himself quite well in the pro se presentation of this case, the evidence established that plaintiff did have a very poor management style that was not suited to the retail environment and that he was unable to meet the legitimate demands of his employer.
Accordingly, plaintiff's claim that he was discriminated against on the basis of his race must be rejected and defendant is entitled to a judgment in its favor.