624 F.Supp. 560 (1986)
Andrew N. WALLACE, Plaintiff,
v.
UNIVERSITY OF MISSOURI, ST. LOUIS, Defendant.
Ernest COX, Plaintiff,
v.
The CURATORS OF the UNIVERSITY OF MISSOURI, Defendant.
Nos. 84-0991C(6), 84-1508C(6).
United States District Court, E.D. Missouri, E.D.
January 14, 1986.
Norman Selner and Kathleen O'Blennis, St. Louis, Mo., for plaintiffs.
Philip J. Hoskins, James S. Newberry and Robert L. Ross, Columbia, Mo., for defendants.

MEMORANDUM OPINION
GUNN, District Judge.
These two Title VII cases arise out of the same decision by the chief of security police at the University of Missouri-St. Louis (UMSL) to promote a white man from patrolman to sergeant. Plaintiffs are black patrolmen and by complaint allege racial discrimination as a result of being by-passed in the promotion process.
This Court has jurisdiction over the parties and subject matter by virtue of alleged violations of Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e, et seq.). Defendant the Curators of the University of Missouri is an employer *561 and plaintiffs are employees within the meaning of 42 U.S.C. § 2000e, et seq.
After trial on the merits, this Court finds from the credible evidence and extant law that plaintiffs' complaint is lacking in substance, and based on the findings of fact and conclusions of law which follow, judgment must be for defendant. There is no credible evidence to support a determination that plaintiffs' failure to receive a promotion or that the promotion of another person to the position of sergeant was the result of any racial discrimination.

FINDINGS OF FACT
Plaintiffs Ernest Cox and Andrew Wallace are black males, each employed as patrolmen for the campus security police for the UMSL campus. Cox has been so employed since August 1976; Wallace has been a patrolman since March 1981.
Plaintiffs' complaint of race discrimination arises over the October 1983 promotion from patrolman to sergeant of Kenneth Hubbard, a white male. Prior to his promotion Sergeant Hubbard held the position of patrolman with the UMSL campus police from July 1980 to March 1981 and from December 1981 to October 1983. The brief lacuna in employment with defendant was of Hubbard's choosing.
Each of these employees possesses somewhat similar backgrounds regarding employment, in that each has experience in working as a police officer with the St. Louis police department.
During Sergeant Hubbard's final ten years as a patrolman with the St. Louis police department, he served as an acting sergeant about 25% of the time with supervisory authority over other officers.
The total number of police within the UMSL police department is 17. The racial makeup is as follows:

 1 chief  white
 4 sergeants  2 black; 2 white
 1 detective  white
 11 police officers  7 black; 4 white
 __
Total 17  9 black; 8 white

William Karabas has been the Chief of Police at UMSL since March 1982. Prior to October 1983, when the sergeant's position at issue in this case became open, Chief Karabas had had only one other opportunity to promote an officer. On that occasion, Chief Karabas appointed James Smalley, a black male police officer, to the position of sergeant.
In October 1983 Sergeant King, a white male, resigned from the campus police department, creating an opening for that position. The remaining sergeants were James Smalley and John Sharp, both black males, and Sergeant Donald Jablonski, a white male. A total of 3 white males, including Kenneth Hubbard, and 4 black males, including plaintiffs Cox and Wallace, applied for the vacancy.
The applicants were interviewed by a panel consisting of Police Chief Karabas and the director and assistant director of personnel at UMSL. Chief Karabas carried most of the interviewing process, as the ultimate decision for making the appointment would be his. Each applicant was asked the same basic questions which were designed to elicit how the applicant would handle discipline of subordinate officers; why he had sought the promotion; why he believed himself to be qualified; what supervisory experience he had acquired during his career; and what improvements he would make in the department.
Though Wallace, Cox and Hubbard had the same fundamental backgrounds in police work, Hubbard possessed substantially more experience as a supervisor of subordinate officers. He also held much better qualification as a supervisor beyond the bare minimum requirements. His responses to questions were also superior in quality to those given by Cox and Wallace.
The police sergeant is the highest ranking officer in the police department with the exception of the Police Chief, and there are no levels of authority between the sergeants and the Chief. In that capacity, the police sergeant on each shift is responsible *562 for supervising the police officers, radio dispatchers and any emergency truck driver assigned to the shift. Thus, supervisory skills are essential to the satisfactory performance of the duties of police sergeant. As a part of those supervisory duties, the police sergeant assigns and reviews the work of the subordinates on the shift and assists the Police Chief, as requested, in making recommendations on hiring decisions. The sergeant is also responsible for disciplining those officers assigned to him, and carrying out directions from the Chief as to the department's operation. In addition to the supervisory responsibility, the UMSL police sergeant is also responsible for performing duties of a police officer.
There also must exist a close personal relationship between the sergeants and the Chief, as they are the only designated supervisors in the department. Mere time of service with the department was not a necessary criterion for promotion.
Both plaintiffs Cox and Wallace exhibited open hostility to Chief Karabas with whom they acknowledged they would have to have a close relationship. At trial, Cox referred to his chief as "dictator" and acknowledged that he had been critical of the Chief and his policies to other police in the department.
Plaintiff Wallace, though acknowledging that Chief Karabas was not racially biased against anyone, expressed a personal hostile attitude for his chief.
It is also apparent from the credible evidence that Plaintiff Wallace does not relate well with his fellow officers.
Major factors which went into the final decision to select Kenneth Hubbard over plaintiffs Cox and Wallace were his superior supervisory experience and his ability to get along with other officers.
It is the trial court's further finding of fact that Plaintiff Wallace does not relate well with fellow employees and that both plaintiffs' obvious hostility and criticism of their superior militates against their being satisfactorily suited to serve as sergeants.
Chief Karabas also relied on the recommendations of Sergeants Jablonski (white) and Smalley (black) that Kenneth Hubbard was much better qualified to be sergeant than either of plaintiffs.
Sergeant Smalley's credible testimony was that Plaintiff Cox had talked of retirement and that Plaintiff Wallace did not relate well and was quarrelsome with other officers.
The credible evidence supports the finding that neither Wallace nor Cox was as qualified as Sergeant Hubbard for the promotion.
There was absolutely no evidence to support a finding of racial discrimination within the campus police department by defendant or any of its employees. Race was no factor in the promotion decision in this case.

CONCLUSIONS OF LAW
There is nothing particularly remarkable about this Title VII case. The pertinent law is clear and has been declared many times.
The leading case articulating the basic allocation of burdens and order of presentation of proof in a Title VII case is Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), which provides the following appropriate rubric:
First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for [his action]...." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.... The ultimate burden of persuading the trier of fact that the defendant *563 intentionally discriminated against the plaintiff remains at all times with the plaintiff.
Id. at 252-53, 101 S.Ct. at 1093.
Though plaintiffs contend that race underlies their failure to be promoted, the facts of the case belie such contention, and they fail to meet the ultimate burden demanded by Burdine of establishing that there was intentional discrimination against them.
The defendant in this instance has articulated a legitimate, nondiscriminatory reason for rejecting plaintiffs' promotion. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973) (employers need to express legitimate basis for rejection of employee). The reason stated for Hubbard's promotion  and, hence, plaintiffs' nonpromotion  is legitimate. Hubbard was much better qualified. He related well with other employees; he had substantially more supervisory experience.
On the other hand, plaintiffs brought about their own downfall by overtly displaying hostility, disrespect and criticism of Chief Karabas with whom they would be required to work in close relationship. Plaintiff Cox displayed lack of zeal for the appointment.[1] Plaintiff Wallace was unable to get along with fellow employees.
The record is totally destitute of any evidence that race was a factor in the selection process. To the contrary, all the evidence was that Captain Karabas treated all employees the same without regard to race and that hirings and promotions were made without regard to race.
The following from Bibbs v. Block, 778 F.2d 1318, 1320 (8th Cir.1985) (banc) is entirely appropriate to the facts of this case in which there is no basis in fact for finding any racial discrimination involved in the promotion issue:
In many Title VII cases, the proof proceeds on both sides on the premise that one motive only on the part of the employer either an illegitimate one (e.g., race) or a legitimate one (e.g., ability to do the job)  has caused the adverse action of which the plaintiff complains. It is this type of case for which the familiar evidentiary framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668] (1973), is designed. After the plaintiff establishes a prima facie case, and the defendant "articulates" (a verb that refers only to the burden of producing evidence) a legitimate, nondiscriminatory reason for the action complained of, the burden then shifts back to the plaintiff to persuade the trier of fact that the defendant's proffered reason was not the real one, but only a pretext hiding an impermissible racial motivation. Typically, the plaintiff will contend that one reason  race  was operative, the defendant will contend that another single reasonability to do the job  motivated it, and the trier of fact will find one reason or the other (but not a combination) to be the true one....

If the District Court in the case before us had found that defendant's reason or reasons for not promoting plaintiff were other than race, and that race played no part in the decision-making process, we should be required simply to affirm the dismissal of the complaint  assuming the finding was not clearly erroneous. (Emphasis added.)
So it is in this case  as distinguished from Bibbs  that the "reasons for not promoting plaintiff[s] were other than race, and that race played no part in the decision-making process." The basis for Hubbard's promotion was on a purely objective, legitimate basis  his superior qualification and ability to do the job, vis-a-vis the plaintiffs, albeit they possessed minimum qualifications. See Fernandez v. Wynn Oil Co., 653 F.2d 1273, 1276 (9th Cir.1981) (An employer's *564 decision to promote justified by superior qualifications.)
The necessity for a close working relationship must be emphasized. There are no interceding officers between Chief Karabas and the four sergeants, and plaintiffs do not challenge that they would be working closely with the Chief and be required to implement his orders. Plaintiffs' personal animosity and distrust of their superior is clearly inimical to an efficient operation and management structure of the police department. Obviously, plaintiffs' attitude toward their chief could translate into ineffectiveness and disloyalty where an intimate relationship between supervisory officers and chief is critical. The situation here is therefore much the same as discussed in Germann v. City of Kansas City, 776 F.2d 761, 765 (8th Cir.1985), and the cases cited therein, observing that "personal loyalty to the chief was critical to the management structure of the ... department."
Plaintiffs in this case by their testimony have given sufficient cause for them legitimately to be passed over in favor of Hubbard.
Plaintiffs have therefore failed to bear their ultimate burden of proving discrimination. United States Postal Service Board of Governors v. Aikens, 460 U.S. 711, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); Hohe v. Midland Corp., 613 F.Supp. 210, 213 (E.D.Mo.1985). There was no evidence of discrimination here. The reason for Hubbard's promotion was not pretextual and served as a legitimate basis for defendant's action.
Plaintiffs suggest that UMSL's statistics for its overall hiring policies for professors within the school bolster their claim of race discrimination policies. These statistics are of little or no worth in this particular situation, where, clearly, no discrimination is shown to exist in the particular department of plaintiffs' employment. Anderson v. University of Northern Iowa, 779 F.2d 441, 443 (8th Cir.1985).
Judgment for defendant.
NOTES
[1] Cox begged off taking training programs offered to and required of other officers.