**Floyd COLON, Plaintiff,**

v.

**Ronald SORENSEN, Commissioner of the Nebraska Department of Labor, Don Haase and Wayne Schroeder, Defendants.**

No. CV86–L–175.

United States District Court, D. Nebraska.

March 2, 1987.

Karen B. Flowers, Lincoln, Neb., for plaintiff.

Jerry D. Slominski, Lincoln, Neb., for defendants.

John F. Sheaff and Laureen Van Norman, Lincoln, Neb., for defendants on appeal.

## MEMORANDUM OF DECISION

URBOM, District Judge.

Floyd Colon, who is hispanic, applied for promotion to the position of Job Service Field Manager in February, 1985. A white anglo male, Bill Weekly, was promoted, and Colon filed a discrimination charge with the Equal Employment Opportunity Commission. He initiated this Title VII suit after receiving notice from the United States Department of Justice of his right to sue. Colon's complaint also alleges violation of the Nebraska Fair Employment Practice Act. Neb.Rev.Stat. §§ 48–1101 to –1126 (Reissue 1984).

The defendants, at all times relevant to this case, were employees of the Nebraska Department of Labor. Ronald Sorensen was the Commissioner of Labor who ultimately approved the promotion of Weekly. Don Haase, who was the Director of Job Services, assisted by Wayne Schroeder, who was the Job Service Staff Operations Chief, interviewed the candidates for Job Service Field Manager. Haase recommended to Sorensen that Weekly be offered the position, and Sorensen approved the recommendation. Schroeder died December 5, 1986, and is dismissed from this suit.

Trial was held without a jury on February 2 and 3, 1987. Colon neither pleaded nor proved compliance with the requirements of the Nebraska Fair Employment Practice Act, so I find for defendants as to the pendant state law claim.

## I. INTENTIONAL DISCRIMINATION UNDER TITLE VII

"The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 800, 93 S.Ct. 1817, 1823, 36 L.Ed.2d 668 (1973). "It is clear beyond cavil that the obligation imposed by Title VII is to provide an equal opportunity for *each* applicant regardless of race, without regard to whether members of the applicant's race are already proportionately represented in the work force." *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 579, 98 S.Ct. 2943, 2951, 57 L.Ed.2d 957 (1978).

Once a Title VII plaintiff has established a prima facie case of discrimination, the burden of production shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision. The plaintiff then has an opportunity to prove that the defendant's reasons are pretextual, a mere cover for intentional discrimination. *See McDonnell Douglas,* 441 U.S. at 801–05, 93 S.Ct. at 1823–26.

The Supreme Court, discussing the elements of a prima facie Title VII case as set out in *McDonnell Douglas,* said that it had

held that a plaintiff could make out a prima facie claim by showing

"(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications...."

This, of course, was not intended to be an inflexible rule, as the Court went on to note that "[t]he facts necessarily will vary in Title VII cases, and the specification ... of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations."

*Furnco*, 438 U.S. at 575–76, 98 S.Ct. at 2949.

The defendants continue to argue that Colon did not establish a prima facie case of intentional discrimination. Although the question is now academic, given that I denied their motion to dismiss at the close of the plaintiff's case, *see United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 714–16, 103 S.Ct. 1478, 1481–82, 75 L.Ed.2d 403 (1983) (merging of the prima facie case into the ultimate burden of proving discriminatory motive), it might be helpful to clarify the standard for establishing a prima facie case of intentional discrimination in promotion cases.

Citing a Fourth Circuit case, *Holmes v. Bevilacqua*, 794 F.2d 142, 147 (4th Cir. 1986), the defendants assert that Colon failed to establish the fourth *McDonnell Douglas* element because the job immediately was filled by hiring one of the several contemporaneous applicants. Not only does the *Holmes* case rigidly apply the flexible elements of *McDonnell Douglas* to promotion facts, *see Furnco* 438 U.S. at 576, 98 S.Ct. at 2949, but it is not the law in this circuit.

> The fourth *McDonnell Douglas* factor might well be modified in promotion cases to require a plaintiff to show that "other employees of similar qualifications who were not members of a protected group were promoted at the time the plaintiff's request for promotion was denied," ... but appellee's argument that *more* is required is in error.

*Bell v. Bolger*, 708 F.2d 1312, 1316 (8th Cir.1983). *Accord Washington v. Dayton Hudson Corp.*, 610 F.Supp. 1120, 1126 (E.D.Mo.1985); *Holmes*, 794 F.2d at 149 (Winter, C.J., dissenting).

Colon's case-in-chief established that: (1) he is hispanic; (2) he was qualified for the position of Job Service Field Manager; (3) he was not promoted; and, (4) a white anglo male was promoted. The defendants produced "evidence that the plaintiff was rejected, or someone else was preferred, for ... legitimate, nondiscriminatory reason[s]." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). Thus, the crucial question in the present case is whether "the presumptively valid reasons for his rejection were in fact a coverup for a ... discriminatory decision." *McDonnell Douglas*, 411 U.S. at 805, 93 S.Ct. at 1826 (1973).

"The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093. Colon may prove that the defendants' reasons for the promotion decision were pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095. He is not required "to submit direct evidence of discriminatory intent." *Aikens*, 460 U.S. at 714 n. 3, 103 S.Ct. at 1481 n. 3.

Stating that Title VII guarantees equal opportunity, and that the hiring process used in filling the Job Service Field Manager position denied opportunity, the plaintiff argues that discrimination has become sophisticated and hidden, and asks the court to find that the hiring process used by the defendants hides discriminatory motives. Because Colon relies on indirect proof of discriminatory intent, I will review the evidence in detail to demonstrate why the defendants' articulated reasons for their decision to hire Weekly for the Job Service Field Manager position are "unworthy of credence."

## II. FACTS

### A. DEPARTMENT OF LABOR DIVISION OF JOB SERVICE

One of the several divisions within the Nebraska Department of Labor, Job Ser-

vice primarily is concerned with matching job seekers with job vacancies. Twenty-seven Job Service offices, each supervised by an office manager, are located throughout the state. Three field managers are responsible for overseeing the operations of these offices and for assisting the office managers with their duties. Haase described these positions as "high level middle management," having "significant management and supervisory duties."

One field manager, called the Metro Area Manager, supervises the Job Service offices in the Omaha area. The Job Service Field Manager for the eastern part of the state supervises the other offices east of Grand Island and Hastings. The Job Service Field Manager for the western and central regions supervises the remaining offices; it was this position that became open in February, 1984. The Metro Area Manager position had been filled the previous month.

## B. THE COMPETITIVE PROMOTIONAL EXAM

The announcement of the opening for Job Service Field Manager advised that the position would be filled by way of a "competitive promotional examination," and that "[a]ll applicants who qualify will be scored according to education and experience, and only applicants who place in the top five scores will be interviewed." Exhibit 2. According to Ronald Ruff, currently a personnel analyst with the Nebraska Department of Personnel, a "competitive promotional examination" means a process that includes the following steps: (1) an internal announcement of the opening; (2) a public announcement (if requested); (3) collection of job applications by the Department of Personnel; (4) an examination of the applications (or of the applicants, depending on the selection device chosen); (5) assignment of points to each application by the Department of Personnel; and, (6) communication by the Department of Personnel of the list of candidates to the department with the vacancy.

The fourth step, application of the selection device, generally involves the use of a "modified E & E" when the job vacancy is for a higher-ranking managerial position. The modified E & E is a scoring device applied to the review of job applications to identify those applicants whose education and experience would qualify them for the job. Employees of the Departments of Labor and of Personnel testified that they work together to identify experience and education factors relevant to a particular job and assign weights to those factors. Personnel then designs the screening tool according to the expressed needs of Labor, and Labor modifies or approves the device.

After the applications for an opening are collected by Personnel, an employee of that department first reviews the applications to weed out those revealing that the applicants are not even "minimally qualified." Then he or she applies the screening tool to an analysis of the remaining applications, which produces a numerical score. A list of the qualified applicants and their scores results. Those having the top five scores are interviewed by Labor. If the list of qualified applicants also includes an "affirmative action register" (a list of minority candidates that can be requested by those doing the hiring), the affirmative action candidates also are interviewed, regardless of their scores.

The "top pool" (highest scorers) on the scoring device are, according to Ronald Ruff, those "who in theory should be the most qualified." His former supervisee, Robert Gottfried, who was involved in designing the screening devices for the Job Service Field Manager and Metro Area Manager positions, testified that the device was good at identifying those most qualified for the job. He said that those with scores at or above 80 (on a one hundred point scale) have "more potential," whereas those with lower scores are "less qualified." There was no testimony that employees of Personnel or Labor ever suggested that hiring decisions be based on the scores from the screening devices. *See* exhibit 109 (illustrating that rank scores of candidates hired/promoted vary widely). The scores are used, however, to distin-

guish those who will be interviewed from those who will not.

## C. SELECTION OF THE METRO AREA MANAGER

Haase worked with Gottfried to develop the screening device for the Metro Area Manager position. After Haase and Schroeder interviewed the candidates, Haase recommended to Sorensen that the Job Service Office Manager in Bellevue be hired. Sorensen, instead, directed that John Pierce, a black male who had been with the Department of Labor approximately one year, be hired. Sorensen testified that Pierce had done an excellent job of getting things accomplished, but had indicated that he would leave the Department unless he was transferred to the Omaha area where he lived. Pierce was listed on the affirmative action register for the Metro Area Manager position with a score of 38. According to Haase, Pierce "did not have one of the best interviews." Sorensen explained at trial that Pierce's score was low because the screening device weighted heavily prior experience in Job Service without giving what he considered to be sufficient weight to other experience within the Department of Labor.

## D. JOB SERVICE FIELD MANAGER SELECTION PROCESS

In response to Sorensen's concern that the screening device used when selecting candidates for the Metro Area Manager position gave too much weight to technical Job Service experience, Gottfried and Haase revised the screening device for use in selecting candidates for the Job Service Field Manager position. Haase testified that the selection process for the Field Manager position, described below in more detail, was similar to that used in selecting the Metro Area Manager candidate.

The factors that Haase decided he would consider in making his recommendation for the new Job Service Field Manager included: form 100 (the application)—the extent of management and supervisory experience; interview performance; reputation; recommendations from three office manag-

ers; the knowledge Haase and Schroeder had of each candidate; and, work attitude. Haase said he "believes" that he made the list of factors, exhibit 8, a few days before the interviews. He testified that he gave "almost no consideration" to the screening device scores, and that the difference between a score of 80 and a score of 96 was not significant.

After receiving the list of qualified candidates from Personnel (which included an affirmative action register), but prior to the interviews, Haase and Schroeder met to draft a list of questions that they would ask each interviewee. See exhibit 9. Haase testified that they "tried to not make [the questions] so job-specific so as to avoid disadvantaging applicants not from Job Service."

Haase testified at trial that he and Schroeder assigned scores of 0–5 to each question during the interviews and then computed an average score for each interviewee. In his deposition, however, he had testified that the questions were not scored separately. He admitted at trial that there were no specific criteria for the assignment of numerical scores; a score of 3 was "average"—what they "expected the candidate to know." Both Haase and Schroeder kept notes during the interviews in which they recorded answers to the questions, their impressions, and the scores for each question. It is standard operating procedure in the Department of Labor for interview notes to be retained and filed with the other materials relevant to the filling of a job vacancy. The notes taken during the interviews for the Job Service Field Manager position have been missing since at least two weeks after the position was filled.

Schroeder and Haase met within 48 hours after completion of the interviews. They compared interview scores and discussed the interviews. They discussed the telephone calls Haase said, during trial, he made following the interviews to three white anglo male office managers. Haase testified that he read the list of candidates to each over the phone, and asked for the managers' recommendations (each selected Weekly). Ken Boyer, office manager in

Norfolk, testified at trial that Haase read the list and asked for a recommendation. His June, 1985 affidavit prepared for the E.E.O.C. investigation said, however, that the question Haase asked Boyer was whether Boyer thought he could work with Weekly. Exhibit 19. Eugene Landkamer, office manager in Lincoln, testified at trial that he had received a telephone call from Haase in which Haase asked him which of the listed candidates Landkamer would recommend. In his June, 1985 affidavit, however, Landkamer said that the conversation between himself and Haase took place in Landkamer's office. Exhibit 20. The June, 1985 affidavit of Cliff Simmons, office manager in Beatrice, said that the conversation between himself and Haase took place in Simmons' office. Exhibit 24.

Neither Haase nor Schroeder reviewed the interviewees' performance evaluations, although Haase was aware of Weekly's because his job required him to review Weekly's evaluations. Reputation, Haase testified, "was simply the things that I would know about that individual." Both Schroeder and Haase agreed that Weekly should be recommended for the position. Sorensen testified that he approved the recommendation and would have questioned a decision to promote Colon.

### E. THE JOB SERVICE FIELD MANAGER APPLICANTS

The applicants, their screening device scores (0–100), their interview scores (0–5), and their affirmative action status are listed below. Those noted with an asterisk were interviewed only because of the affirmative action register:

| | | |
|---|---|---|
| 96 | Floyd Colon (minority) | 2.0 |
| 92 | Larry Fitzgibbon | 3.6 |
| 92 | Candace Beach (female) | 2.4 |
| 84 | William Weekly | 4.5 |
| 84 | James Baudler | 3.4 |
| 83 | Robert Nieto (minority) | 3.5 |
| 80 | Virgil Hiatt (minority) | 2.3 |
| 80 | William Engel | 2.8 |
| 73 | Rick Nelson | 4.2 |
| 40 | Thomas Bartell* (disabled) | 3.0 |
| 38 | Carol Kolb* (female) | 1.7 |
| 29 | Rita Hill* (female) | 2.0 |

See exhibits 7, 10, 105, 106. The interview scores, listed in the right column, are highest for anglo males. The average screening device score for minority male applicants was 86.3; for anglo males it was 76. The average interview score for minority male applicants, however, was 2.6; for anglo males it was 3.7. Scores of minority male applicants, then, were higher than those of anglo males in the objective scoring process, but significantly lower than those of anglo males in the subjective scoring process. Haase did not know until he received the list of candidates that Nieto was a minority; Nieto was the only minority candidate whose interview score was not below "average."

Haase and Schroeder reviewed the candidates' applications before conducting the interviews. Weekly's application reveals that he held an undergraduate degree in business administration, with a minor in physical education, and had been with the Department of Labor since 1970. See exhibit 5f. For the first five years his title was Employment Supervisor, and he supervised six persons (clerical, counselor, placement interviewers); at the time he was promoted he was manager of a Job Service office and supervised five persons.

Colon's application showed that he held an undergraduate degree in psychology, with a minor in sociology, and had been with the Department of Labor since 1963. See exhibit 5a. Colon held the position of Public Relations Officer at the time he interviewed for the Job Service Field Manager position. In four of his positions with the Department he supervised one clerical worker. For nine years, 1969–1978, he was Nebraska WIN Coordinator and supervised 26 employees (supervisors, counselors, interviewers, secretaries).

The performance evaluations used by the Department of Labor employ a 0–4 rating system (0 = unsatisfactory; 1 = marginal; 2 = satisfactory; 3 = commendable; 4 = superior). Colon's over-all rating was 3.142 in 1982, see exhibit 12, and 3.285 in 1983, see exhibit 13. Weekly's over-all rating was 3.43 in 1982, see exhibit 14, and 3.57 in 1983, see exhibit 15.

The higher administrators in the Department of Labor were aware that Colon is

hispanic, and that he had, on previous occasions, complained to them about inequities that he perceived in job grade classifications.

### F. HAASE'S REASONS FOR SELECTION OF WEEKLY

In his memo to Sorensen recommending Weekly for the Job Service Field Manager position, Haase said that "the interviews were scored on the basis of our judgment of the quality of their responses," and that he and Schroeder considered "the qualifications, the interviews, and other related factors" in reaching their decision. Exhibit 106. Haase testified at trial that the interview ranked first in importance, followed by the application (but without consideration of the score), in the decision to hire Weekly. In his deposition, Haase said that the person who interviewed best would be the one who got the job. His trial testimony revealed that the scoring of the interview was based on the expectations he and Schroeder developed from reading the applications and on their impressions about what they happened to know of the candidates.

Haase's trial testimony ultimately identified five factors that he considered in evaluating the candidates: interview performance; the application; work product; recommendations from three Job Service office managers; and, reputation. Haase testified that Weekly had "the strongest interview," was "thorough, concise," and had "full knowledge of management situations." In regard to the information on Weekly's application, Haase said that Weekly's Job Service experience was "a significant factor" contributing to his promotion, and that, of all the candidates, his experience was the most "directly related" to the position. Weekly "performed well" in his office manager position, a conclusion Haase based on reviewing Weekly's performance evaluations and on his personal knowledge. The three office managers contacted by Haase approved of Weekly. Finally, Haase apparently felt Weekly had a good reputation.

Haase admitted that reputation, as a factor in evaluating candidates, consisted of "simply the things that I would know about that individual." He had no systematic method for assessing reputation, nor did he verify the impressions that he carried into the decision making process. He testified that managers had complained to him about Colon's "nonresponsiveness to requests," but admitted that this information never was relayed to Colon, who testified that he was not told of the office managers' complaints. Colon's 1982 and 1983 performance evaluations do not reflect any concerns about the supposed "nonresponsiveness."

Haase testified that Colon's application suggested that he was "most eligible" for the position on the basis of his screening score (96). Colon did not have recent Job Service experience, however, which Haase said he deemed important.

Colon's interview with Haase and Schroeder lasted approximately 20 minutes. He was asked each of the 12 questions, and also was asked whether he could work with Bill Foster, then the Director of Job Training. Bill Foster is black. Haase testified that he felt Colon "was good at communication." He said that he "felt that Floyd's [answers] were somewhat less than I expected.... His answers lacked substance." Haase never returned to the Department of Personnel the reason(s) why Colon and the other applicants were not hired. The register of candidates sent by the Department of Personnel to Don Haase at the Department of Labor included this notice:

PLEASE RETURN TO THE PERSONNEL SECTION ... REASON(S) WHY THE PERSON(S) LISTED WERE NOT HIRED. THE REASONS SHOULD BE AS FACTUAL AS POSSIBLE. THIS INFORMATION IS NEEDED FOR THE POSSIBLE REMOVAL OF UNDESIRABLE APPLICANTS FROM THE REGISTER AND TO MEET THE REQUIREMENTS OF THE CIVIL RIGHTS ACT OF 1964.

Exhibit 7.

### G. THE DEPARTMENT OF LABOR'S RECORD ON MINORITY HIRING AND PROMOTION

Richard Campos, the Equal Employment Opportunity Officer for the Department of

Labor testified that the Department has a "poor record of promoting minorities." He explained that "we have hired minorities but we haven't done anything for them." Campos had requested to sit in on job interviews to better monitor the subjective processes occurring during interviews. He has been present during a small number of interviews, but not during those involving high-level management positions. Sorensen testified that he perceived a conflict of interest in Campos being present during the interview and then being the person to whom dissatisfied interviewees would take their grievances.

Sorensen said that increasing minority representation within management was one of his goals when assuming the commissioner's role. He was responsible for implementing the use of affirmative action registers in the competitive promotional exam process. No affirmative action registers were used during 1982, the year before Sorensen assumed his office, *see* exhibit 21—but only a few were used in 1983 and 1984. A quick scan of the 1983 registers revealed that only 10 out of approximately 193 candidate listings included affirmative action registers. *See* exhibit 22. Of approximately 93 registers in 1984, only 7 included affirmative action listings. *See* exhibit 23.

Data prepared by the Department of Labor reveal that, as of July 1984, the Nebraska work force was 2.5% black and 1.6% hispanic. *See* exhibit 108. Of the Department of Labor's professional employees, 6% were black and 2% were hispanic. Among executive, managerial, and administrative employees, 7% were black and 4% were hispanic. *See* exhibit 112.

Positions with the Department of Labor are classified into 20 or more pay grades. The Job Service Field Manager position was at pay grade 16. Colon's position in early 1984 was at pay grade 14; Weekly's was at grade 13. During the period from December 31, 1982, to January, 1986, no hispanics were employed by the Department above pay grade 14. *See* exhibit 17. As of July, 1984, the employees in the top

pay grades at the Department were as follows:

| | |
|---|---|
| 20: | 1 black male |
| 19: | 3 anglo males |
| 18: | 2 anglo males; 2 anglo females |
| 17: | 9 anglo males |
| 16: | 11 anglo males; 2 anglo females; 1 black male |
| 15: | 13 anglo males; 5 anglo females |
| 14: | 27 anglo males; 6 anglo females; 2 black males; 3 hispanic males; 1 hispanic female |
| 13: | 12 anglo males; 8 anglo females; 1 black female; 1 hispanic female; 1 "other" |

*See* exhibit 111. These data reveal two persons out of 49 employed above pay grade 14 who are minorities. The black male employed at grade 16 was John Pierce, selected by Sorensen to be Metro Area Manager, as described above. The black male employed at grade 20 was Joseph Foster, who was not selected by means of a competitive promotional examination.

In support of his contention that the Department of Labor has done a "good job of advancing minorities," Sorensen referred to Foster and Pierce, and two women promoted to division heads, among them the new Director of Job Service (replacing Haase). Neither Pierce nor the new director had prior Job Service experience; both were fairly new to the Department of Labor.

## III. ANALYSIS

Title VII requires "equality of employment opportunities," *McDonnell Douglas*, 411 U.S. at 800, 93 S.Ct. at 1823, "without regard to whether members of the applicant's race are already proportionately represented in the work force," *Furnco*, 438 U.S. at 579, 98 S.Ct. at 2951. The statistics describing the Department of Labor's work force reveal that the percentage of black and hispanic workers in professional, executive, managerial, and administrative positions is at or above the percentage in the Nebraska work force. Among the 49 positions above pay grade 14, however, only 2 were filled by racial or ethnic minorities (Pierce and Foster). It appears that no racial or ethnic minorities have been promoted to upper management by way of the

competitive promotional examination process. The infrequent use of affirmative action registers, one of the asserted tools for increasing minority promotions, is telling.

The defendants' rely on a highly subjective hiring process to support their asserted nondiscriminatory reasons for the hiring decision at issue. Hiring decisions do involve many factors, some legitimately subjective. *See, e.g., Burrows v. Chemed Corp.,* 743 F.2d 612, 616 (8th Cir.1984) ("personality clash" and "need for productive development experience" were nondiscriminatory factors); *Wallace v. University of Missouri, St. Louis,* 624 F.Supp. 560, 563–64 (E.D.Mo.1986) ("animosity and distrust of ... superior" and inferior qualifications were legitimate reasons for not hiring complainant). Nevertheless, "[a]lthough not illegal *per se,* subjective promotion procedures are to be closely scrutinized because of their susceptibility to discriminatory abuse." *Royal v. Missouri Highway and Transportation Comm'n,* 655 F.2d 159, 164 (8th Cir.1981).

The mere fact that the subjective process is intended to recognize merit does not necessarily alleviate its susceptibility to discriminatory abuse. When the evaluation is in any degree subjective and when the evaluators themselves are not members of the protected minority, the legitimacy and nondiscriminatory basis of the articulated reason for the decision should be subject to particularly close scrutiny by the trial judge.

*Id.*

This case presents the anomaly of an employer with expertise in employment matters nevertheless using, at best, an extremely sloppy and subjective method in making upper management promotion decisions. The factors influencing the promotion decision appear, essentially, to be four-fold: (1) interview performance; (2) experience and education, as revealed on the applications; (3) what Haase and Schroeder happened to know about the candidates (reputation, work attitude, work product); and, (4) recommendations from selected Job Service office managers. This list reflects the apparent ranking of factors, according to Haase's testimony. I shall discuss the factors in inverse order.

The contradictions between the trial testimony and the earlier affidavits of the office managers, combined with the questionable use of the opinions of only selected office managers (all white anglo males) compel the conclusion that office manager opinions not be considered a credible, nondiscriminatory factor in the promotion decision. Haase admitted that he realized at the time that the recommendations should be accorded little weight, and I accord them none.

Haase testified that "work attitude" was not a factor ultimately considered in the decision making process, although he had listed it as one initially. *See* exhibit 8. Even presuming that it was not a factor, two other sets of subjective impressions expressly were factors: work product and reputation. These impressions were based solely on what the Haase and Schroeder happened to know.

Haase did not consult with the candidates' supervisors. He did not review their performance evaluations. He did not verify the impressions that he did have. He relied on impressions about Colon based on criticisms that never were relayed to Colon. Presuming it is true that Colon was "slow in responding" to requests by office managers, failure to relay that information to him denied him the opportunity to improve his performance. To use those unrelayed complaints in making a promotion decision is unfair. This appears to illustrate the problem, as perceived by Campos, of the Department hiring minorities but then "not doing anything for them." The performance evaluations of Colon and Weekly do not reveal significant differences between them. Haase happened to know of Weekly's evaluations, however, but did not consult Colon's or the other candidates' evaluations.

What Haase and Schroeder happened to know, used as a basis for distinguishing between candidates, is so irregular and subject to the biases of their particular information networks as to be a freakish

basis for ranking candidates. That no effort was made to collect, systematically, relevant information about each candidate or to verify the impressions that they did have strongly suggests a disinterest in challenging their impressions and gathering a uniform set of information about each candidate.

According to Haase, the second most important factor in the promotion decision was the applications. He was involved in revising the screening device used to select the candidates. It was designed to place less emphasis on technical Job Service experience. (The interview questions also were designed, he said, to give less emphasis to technical Job Service experience.) Those with the top scores on the screening device were considered "most qualified" for the job, based on factors and weights determined by Haase to be relevant. Nevertheless, in selecting Weekly technical Job Service experience became important to Haase. Additionally, although he did not ask that the screening device reflect this, recency of managerial and supervisory experience apparently became important. Colon had had nine year's of experience during his time with the Department supervising 26 persons as Nebraska WIN Coordinator. This experience was accorded weight on the screening device. Haase seemed to be testifying that, because the experience was not recent, it was given too much weight—yet he approved the screening device. Technical Job Service experience, allegedly important in the decision to promote Weekly, did not appear important in the promotion of the Director of Job Service or of Pierce to the Metro Area Manager position.

The interview was the most important, and, if Haase's deposition testimony is believed instead of his trial testimony, the one factor influencing the promotion decision. Nearly all of the useful information concerning interview performance and the reasons the rejected candidates were not hired no longer exists. The interview notes are missing. The factual reasons for not selecting the rejected applicants never were recorded and returned to the Department of Personnel. The disparity between the objective application screening scores and the subjective interview scores highlights the importance of identifying and carefully rating subjective factors during the interview, if it is to be the main (or only) factor used to distinguish between the candidates.

The scoring "system" used during the interviews appears to be no system at all, but, rather, an extension of the impressions held by Haase and Schroeder. The sole criterion for scoring was "what [they] expected the candidate to know." While it is true that evaluating interview performance is a subjective process, it need not be standardless. The interview scoring in this case was standardless in two ways. First, no specific criteria for evaluating the candidates were developed to guide the interview scoring. Second, to the extent that scores were assigned based on performance as compared to what the interviewers expected each candidate to know, an entirely non-uniform rating process occurred—one derived from expectations based on what the interviewers happened to know about the candidates.

The plaintiff has demonstrated that the promotion process did not ensure equality of opportunity and that the reasons offered by the defendants to explain their selection are pretextual. He has met his burden of proving intentional discrimination by a preponderance of the evidence. *Cf. Bell v. Bolger*, 708 F.2d 1312 (8th Cir.1983).

## IV. REMEDY

"[F]ederal courts are empowered to fashion such relief as the particular circumstances of a case may require to effect restitution, making whole insofar as possible the victims of . . . discrimination in hiring." *Franks v. Bowman Transportation Co.*, 424 U.S. 747, 764, 96 S.Ct. 1251, 1264, 47 L.Ed.2d 444 (1976).

Colon is entitled to a declaration that he was discriminated against on the basis of his national origin, in violation of Title VII, 42 U.S.C.A. § 2000e–2 (1981). He shall be awarded back pay in the amount of $13,-357.09, and the Department of Labor shall add $1602.85 to Colon's retirement account.

When a promotion opportunity at pay grade 16 occurs for which Colon is qualified, he shall be promoted to that position. In the interim, he is entitled to front pay of $2883.01 per month. Costs of this action will be taxed to the defendants. Colon is entitled to recover a reasonable attorney's fee.

### ORDER

For the reasons discussed in the accompanying memorandum,

IT IS DECLARED that the defendants discriminated against the plaintiff on the basis of his national origin in violation of Title VII, 42 U.S.C.A. § 2000e–2.

IT IS ORDERED that upon resolution of the amount of attorney's fees to be awarded judgment shall be entered for the plaintiff and that the plaintiff is awarded:

1. back pay in the amount of $13,357.09;

2. a contribution to his retirement account in the amount of $1602.85;

3. front pay in the amount of $2883.01 per month, plus fringe benefits commensurate with this rate of pay, until a position at pay grade 16 for which the plaintiff is qualified becomes available and to which he is appointed.

IT FURTHER IS ORDERED that the costs of this action are taxed to the defendants, and that the plaintiff is entitled to a reasonable attorney's fee. The plaintiff's counsel shall submit to the court within 10 days an affidavit setting forth her claim for attorney's fees; the defendants shall have 7 days thereafter to submit an affidavit in response.